20-1313 et al. City and County of San Francisco Petitioner v. Federal Energy Regulatory Commission. Ms. Mapes for the Petitioner, Mr. Ettinger for the Respondent, Ms. Ward for the Intervener. We'll just wait to begin until the court clears and counsel for the next case come in. Good morning, counsel. Ms. Mapes, please proceed when you're ready. Good morning, Your Honors, and may it please the court. We're here to talk about a practice that PG&E has imposed under its wholesale distribution tariff, under which it denies secondary service for all but the smallest of loads. That secondary service allows loads to connect at a lower voltage level without expensive primary facilities that could cost hundreds of thousands more. If it's too expensive or if it's physically impossible for San Francisco to install those primary facilities, San Francisco loses the customer. It becomes a PG&E retail customer. PG&E then serves those facilities using the same secondary facilities it would not allow San Francisco to use to serve the customer. FERC should have rejected this practice as the anti-competitive pretext that it is. Instead, it rubber-stamped it. In doing so, it did not make a single finding that the medium size or small loads discussed here interconnected to secondary threaten the reliability of the grid. It did not address a single operational argument made by PG&E or San Francisco's rebuttals to that argument. It did not even explain why PG&E can serve its own loads of that size as secondary, why it can serve previously connected San Francisco loads as secondary, why it can serve loads belonging to other wholesale distribution customers as secondary. The agency did submit an affidavit or declaration that talked about safety and reliability. I understand your point that at least I haven't found in the record a place where the agency said, for example, San Francisco requests X, but if you look at X, which PG&E denied for secondary service, there are safety problems in that 1, 2, 3, 4, and there are reliability problems, 1, 2, 3, 4. So that's not there. But what is the burden here? Because FERC's orders describe the system. It describes the relationship that's been going on for many years. And now it also says that it's not as though there's an actual policy because sometimes San Francisco's requests have been approved. So what measure of specificity is required here? Your Honor, I have a couple of answers to that. The first is that under the Federal Power Act, FERC's decisions need to be supported by substantial evidence. Well, that's more than a scintilla. All right. So that's why I want to know. That's correct. It's not as though the agency didn't describe a system. It described in terms of arguments just this morning, it's self-evident. This is a complex system. Involves many interconnections. PG&E has to make these determinations. And it has made these determinations and said why, but it hasn't said in this particular example, we didn't think the safety was adequate. Your Honor, I think there's a number of things in the record that make FERC's rather conclusory determination that PG&E should have total discretion, not supported by substantial evidence. The first is that, as you noted, FERC found that PG&E does not have a policy of denying these loads. It grants them in some situations. That is actually flatly contradicted by the record. The record shows, and PG&E readily conceded in its brief, that in July of 2019, PG&E informed San Francisco that while in the past it had granted a few accommodations for loads above 75 kilowatts, it was no longer going to do that going forward. That is in Joint Appendix 284, and you can see PG&E. That's not what the commission was reviewing in the decisions that we're considering, right? That's a prospective determination that still, as I understand it, that still hasn't been finally resolved because it's pending now. I would disagree with that, Your Honor. It is true that after the commission issued its decision in this case, PG&E then filed a new tariff stating that it would not grant secondary service at all. However, the July 2019 letter was before the commission in this case. It was under the previous version of the wholesale distribution tariff that was before the commission, and the commission did not address that in its order. There's actually another part of that that the commission failed to address, which is that if you look at the charts that PG&E included below FERC and that FERC included in its brief here, FERC uses those charts as evidence to show that PG&E was granting secondary service on a regular basis. San Francisco alleged in its complaint that PG&E began this practice in late 2017, I believe November of 2017. Most of the instances where loads over 75 kilowatts were connected shown in those charts are in 2015 or 2016. There's a few in 2017, and there's only three in 2018. Because FERC didn't set this case for hearing, the record is not as developed as it might otherwise have been. But I think of the very few secondary in 2018, many of them might have been in process before 2017. So San Francisco filed this complaint relatively soon after PG&E began this new practice. FERC did not set it for hearing, and PG&E became more definitive about its practice as the briefing was ongoing at FERC. It was clear that as of July 2019, PG&E would not accept any more requests for secondary service above 75 kilowatts. The other thing I would say about that is that the tariff actually has a definitive process to ensure that the safety and reliability of the system are maintained. If you look at the tariff itself, it has a process by which San Francisco or any wholesale distribution customer submits an application. PG&E then has an obligation to do what is called a system impact study at the customer's expense to determine whether that interconnection can be undertaken safely. If it cannot, PG&E has the obligation to use due diligence to expand or modify its distribution system to provide the requested service. The distribution system in the tariff is explicitly defined to include the secondary system. PG&E has not been doing that, and it has stated so in the record. When it receives a request for secondary service above 75 kilowatts, its practice as of 2017 has been to deny it and to tell San Francisco to submit a new application for primary service. It does not perform the required system impact study. So there were a few cases in which San Francisco was able to go through a lengthy negotiations process with PG&E to resolve the issue, but it was not receiving proper service under the tariff. Am I right that the tariff itself is silent on where PG&E has to provide primary and secondary service, right? It is, Your Honor, as to which voltage levels. Yeah, so in that case, I mean, don't we have to defer to the Commission's interpretation? Your Honor, I would say that the Commission is entitled to deference as to its interpretation of the tariff. I would also say that because the Commission disregarded the process the tariff lays out, the system impact study process, the obligation to expand and modify its distribution system, it does not pass the arbitrary and capricious test. And even with deference, its interpretation fails. San Francisco is not, as PIRC seems to be stating, stating that it gets total discretion over which voltage levels can be interconnected. It wants the tariff process to be followed. And what do you do with the Commission's statement that in utility-utility interconnections, when you're talking about utility-to-utility interconnections, that primary service is the norm in the industry? Your Honor, I would state that that's misleading. You would say what? That that's misleading. And in fact, I think we use sloppy language in one of our briefs as well, and I apologize for that. Utility-to-utility interconnections are normally at higher voltage. In many cases, most cases, I believe, that would be at transmission-level voltages, where you would have, say, PG&E interconnecting with its southern neighbor, Southern California Edison. That's even higher than primary. That's even higher. So the kind of situation we have here, where San Francisco's loads are dispersed within PG&E's service territory, is relatively unusual. It is not unheard of. There are other wholesale distribution customers, particularly the Western Area Power Administration, that has a very similar setup and which does receive secondary service. I didn't read you to be taking issue with the premise that, putting aside the situations in which it's even higher than primary, that primary would be the normal mode for utility-to-utility. I didn't read your briefs to be taking issue with that. I don't think we would. I think we fully admitted this is a relatively unusual situation. I would also say that even if we took primary service in all these circumstances, it would still be an unusual situation. The interconnection is just not the normal one. You're welcome to continue or to reserve your time for rebuttal, whichever you prefer. Well, I would make one more point, which is that I think it is worth talking about the Western Area Power Administration for a minute. That is another wholesale distribution customer that is similarly situated to PG or to San Francisco. Could you just say, who are you talking about? It is the Western Area. Oh, okay. Now I know. I just didn't hear you. That's what the… Western Area. Okay, fine. The one that had a settlement agreement. Yeah. They have a settlement agreement with PG&E. I think they do take service under the same wholesale distribution tariff. That settlement agreement is pursuant to the same wholesale distribution tariff and enables them to take service under it. Like San Francisco, Western has many small points of interconnection scattered throughout the area in which they operate. In San Francisco's case, that's more constrained within the city. In Western's case, it's more spread out in Northern California. PG&E allows the Western Area Power Administration to add these new secondary points of delivery. It has not pointed to any physical or operational or technical differences between them. As far as we are aware, as in the record, none exist. The fact that Western receives this service pursuant to a settlement does not allow, under this court's precedent, FERC to claim that entirely insulates it from undue discrimination. This is open access service. Every customer under this tariff should receive comparable service if they're similarly situated. And that is not something that has happened to date. And if there are no further questions, I can reserve the remainder of my time for rebuttal. Your Honor. Thank you, Ms. Mapes. We'll hear from the commission now. Mr. Attagir? Good morning. Thank you, Your Honor. May it please the court. I'm Scott Attagir for the Federal Energy Regulatory Commission. And thank you for hearing the case today. There are just a few points I would like to make in response to the arguments by San Francisco. And I do want to begin by emphasizing the point that the commission has made throughout the orders, challenged orders, is that the normal norm for interconnection from utility to utility is to connect at primary. And it truly is something exceptional that San Francisco is asking for here. And, again, as we were just discussing, the only other arrangement of an eligible customer under this tariff is with the Western Power Administration. And I want to go straight to that. The commission addressed the settlement. But isn't the – I mean, that may be the norm, but this all goes back to this Pechechi arrangement where Congress – the whole thing was designed, as I understand it, to let San Francisco compete, right, with providers like – with utilities like PG&E. It's a different – because of this history, it's not your normal utility-utility connection. Isn't that right? This is indeed. And also, you know, and if you look at what PG&E has done in both of these cases, with its narrow interpretation of the grandfathering clause and with its limiting of secondary service, it's basically eviscerated or greatly limited the ability of San Francisco to compete, which was the purpose of this whole Pechechi project 100 years ago, wasn't it? I don't think so, Your Honor. I think San Francisco still can compete, and it just has to follow. I think what the commission is saying here is San Francisco has to follow the industry norm. Well, in other words, it can't compete the way it used to, right? I would agree with that, Your Honor. Okay. And isn't that a pretty strong argument for suggesting that the normal utility-to-utility practices just don't apply in this case? We have a different situation. I would respond to that. It is an unusual situation, but I would respond to that by taking the next point from the industry norm, is the next point is that there's actual practical explanation for why this is the industry norm. And while this is an unusual situation, those practical matters still apply here. And the commission addressed this in the initial order, what we call the 2020 order at paragraph 38. This is at JA363, where the commission made the finding that primary facilities are necessary for the safe and reliable operation of the system. And I would also reference the court to paragraph 22 of that same order. This is at JA357. The commission there described a little more about PG&E's rationale and explanation. Let me just interrupt you. I have a couple questions. I'm sorry to interrupt you, but you've raised a couple of issues. You just said that, I think you just said that, you know, PG&E is responsible for the safety and reliability of the system, right? But I didn't see any place in the record where FERC addressed whether or not the voltage level related to safety. Where did it do that? Where did FERC say that above 75 creates a safety or reliability problem, but below 75 doesn't? The link is to the facilities. To the what? The link is to the facilities. And what the commission is saying is that primary facilities achieve the safety and reliability benefits. But that's the conclusion. That is a conclusion. This is an APA case, right? Yes. So FERC's decision has to be, FERC has to respond to the arguments that are made by San Francisco here. And one of their arguments is that FERC hasn't demonstrated that there's a relationship between safety and these particular levels. They say also that under 13.4, PG&E has to exercise due diligence to expand its distribution system to provide secondary services whenever they ask for it. Now, they may be right or wrong about that, but they say there's nowhere in the record where FERC responded to that. But their point is they've made arguments about PG&E's responsibility to respond to their request for secondary service. They've made arguments that there's no rational connection between the particular levels that PG&E has picked here. And their argument is that FERC didn't respond to any, which is kind of classic APA, isn't it? The commission did respond to the service argument. And that leaves the commission's analysis. Wait, what do you mean by this? You mean the first or the second points I made? I'm sorry, Your Honor, I can't. The first or the second point. Which did FERC respond to? The commission made the finding that PG&E has not denied service to San Francisco. And in support of that, I would point the court to Section 215 of the tariff. And this is in the Joint Appendix and the other case. What about the letter that Ms. May mentioned? Which letter? The letter where PG&E, she said, yes, they were providing service on a case-to-case basis. But there's a letter dated July 2019. Yeah, the July letter, which says we're not going to do it anymore. And FERC didn't respond to that either. The commission did make the finding in a couple places in that the rehearing order, paragraph 10, note 27, this is a JA-15, that some of the examples that we cite in our brief had occurred after 2017. And I'll also point out that PG&E filed this information in, I believe the information went up through 2018, and PG&E filed it in May. So it provided the most up-to-date information. And that's the information that we relied on in our brief. And I think it demonstrates a couple things, that of the interconnections that have been made since San Francisco started taking service in 2015, over 40% have been for greater than 75 kilowatts, and a majority of those have been at secondary service. So it just doesn't, it's not the case that PG&E has been denying service to San Francisco under the tariff. Can I ask a question about the, although I don't want to cut off Judge Badle if... Go for it. I have a question about the filed rate doctrine and its applicability here. So as I understand the commission's understanding of the filed rate doctrine, if there were an unwritten policy to the effect that for loads larger than 75 kilowatts, the service is going to be primary service. That's not anywhere spelled out in the tariff, obviously. But if that were the policy that PG&E were implementing, then it would be inconsistent with the filed rate doctrine not to have that policy in the terms of the tariff. I think that's right, Your Honor, and I think that's what the commission was getting at. Right, so then the question becomes, yeah, I think that is what the commission was getting at, at paragraph 12 on JA 416 to 417, as I read that. And so then the question becomes, if that would need to be in the tariff, then if there's a policy that that's just a default assumption, as opposed to an inexorable rule, it's a default assumption that if it's above 75 kilowatts, the service is going to be primary, but we can have a negotiation to figure out whether we're actually going to allow secondary service. And why doesn't that also need to be in the tariff? What's the difference between an ironclad rule and a default assumption for purposes of the filed rate doctrine? For the filed rate doctrine, I would refer the court to the rule of reason here. This is what Your Honor is suggesting would be a very difficult rule to codify in the tariff. And what the commission has found here is that PG&E has actually been flexible in its application. But I don't know what's difficult about the default assumption. I mean, it may be that what's difficult is what happens to try to controvert the assumption. But in terms of the existence of the assumption to begin with, it seems like a pretty straightforward specified rule, which is that the default assumption, unless we put it this way, if there's no further submissions by the city, then service is going to be primary if the load is over 75 kilowatts. Not inexorable, because there could be some other stuff. And I might agree with you that as to the other stuff, that's not reducible to the level of specificity that would implicate the filed rate doctrine. But in terms of the existence of the assumption in the first place, because it's tethered to a particular level, 75 kilowatts, and it just implements an assumption, I don't know enough about it, and I'm not suggesting that I know the answer. I don't know enough about the filed rate doctrine to understand why there would be a distinction between a rule that would have to be in the tariff and a default assumption that's equally specific as to 75 kilowatts, but for some reason that doesn't have to be in the tariff. At the end of the day, I think in both cases, whether the assumption is in the tariff or whether it's not, at the end of the day, this is something that PG&E was flexibly working with San Francisco. And I guess my answer would be that it wouldn't matter because what really matters is the particular facts of the case. And these are the things that we couldn't codify easily in the tariff. And I think under the rule of reason, the commission was right not to demand that codification. And the commission referred to some of these things in paragraph 43 of the 2020 order that said J.A. 366. It talked about load size, location, and other factors. There's also references in the record when a request is made too far from the facilities, that secondary voltage isn't sufficient to serve that. But here you have San Francisco. It's not all spread out. And then the other comment was, well, some of the parts are not numbered. So it's difficult for inspectors to inspect and report. I mean, that's just so put some numbers on. You know, it seems to be the obvious response there. And then if there is some part of northern San Francisco that's too far, FERC can say that. But it hasn't said that, has it, as to particular requests. And now we have this letter. And I know your point about you're just going to 2017. These options aren't available. So do you understand that to mean that even if you're in settlement negotiations, FERC would not be able to agree? I'm sorry. I'm not sure I follow the question. We're all having problems getting our questions across. All right. Your position, as I understand it, is PGE is willing to negotiate on a case by case basis. And it put that chart out and the agency put in its opinion. But then San Francisco comes back. It talks about what's really happening on the ground. And I don't see where the response to that exists in the order. I mean, it talks about factors, et cetera. It talks about an industry preference. But San Francisco and I don't see PGE saying we're different for all these reasons about all these multiple interconnections. A lot of them are high voltage areas. In other words, if you read the record, it looks like there is a settled position. Well, I respectfully disagree with that, Your Honor. And I think our charts support what the findings of the commission were. The commission and the commission made the specific finding that the interconnections had continued. But you would agree, wouldn't you, that all of San Francisco's requests are not in remote areas. And that all of San Francisco's requests, if they involve units of the system that are not marked, they can be marked. Yes, Your Honor, in addition to the point about the markings of the facilities, the PG&E. Also, and the commission talks about this in paragraph 22, this is a JF 357. And there the commission sites PG&E's answer at page 17. And also the previous paragraph 21. And further references to the answer and the declaration of PG&E's. Okay, we've been through that, haven't we? These are general statements. They're not specific to particular requests by San Francisco. And furthermore, do you agree that PG&E is not following the tariff provision? No, I don't agree with that. I believe what the tariff says is that PG&E must provide service. And service is defined in section 215 of the tariff. And this is in the JA on the other case, JA 378. Well, take Judge Tatel's questions as framing the question. And you can put San Francisco out of business, basically. I understand that because it doesn't say. PGA has to provide the service that's requested. But doesn't it have to say why you can't have it, particularly since there are these provisions of the tariff. Talk about expanding facilities and also having a study done at San Francisco's cost. That's right, Your Honor. There is a provision in the tariff for expanding the system. And that's at 13.4 of the tariff. There are two problems with that. First of all, that section refers to denial of service under the tariff. And then I would refer the court back to the definition of what is service under the tariff. And that's section 215. Your conception is it's anything PG&E says it is, right? So what do you do with the other provision that says that there's supposed to be this study at San Francisco's expense? I would point out that, furthermore, in that section, there's a reference to good utility practice. And that gets us back to where we started with this, is that the arrangement to provide utility-to-utility service at secondary voltage is entirely novel and entirely... Well, it's not, counsel, on this record. Because we know that settlements are entered. We also know that some of PG&E's customers, own customers, are receiving secondary service. So that's just not a viable argument, is it? So a couple things in response to that. First of all, with respect to the one other eligible customer that's receiving secondary voltage. That is by settlement. And the commission discussed that in its order. No, it says it's under section 210 and 211. We're under 206. Yes. Therefore what? The tariff still applies in all those cases. Well, what the commission was saying in paragraph 42 of the initial order was that the arrangement with Western is a bargain for arrangement that resulted from a settlement. My point, counsel, is that I'm not contesting that that is what happened. But the fact that PG&E agreed suggests that maybe the fact these utilities aren't marked, maybe the fact that there don't seem to be any safety problems. It would be an unusual situation, would it not, for PG&E to agree to such a settlement. If it forced it to violate good utility practice and everything else. I think that's right, Your Honor. But I think that's only part of the equation. The import of the bargain for agreement is that there was a tradeoff. And PG&E, I would submit, made a determination in the settlement that allowed for it to accommodate this unusual circumstance for Western. So you acknowledge at the beginning that San Francisco presents an unusual circumstance. It's not the typical. Yes. All right. So I don't know where these arguments get us. Doesn't the agency have to be more specific? The agency was specific here, I would submit, Your Honor. I see I'm out of time. You can answer that question. I know that Judge Chadle has another question as well. I would just refer the court again to the norm that the commission found here and the unusual circumstance of connecting at secondary for the utility to utility connection. And I would refer the court as well to paragraph 38 of the initial order, which fleshed this out in addition to its summary of PG&E's arguments at paragraphs 21 and 22. Mr. Edinger, I've spent quite a bit of time trying to figure out the relationship between this case and the next case. And since you're arguing that, I think that's a fair question for me to ask you this question. Which is it? And I want to emphasize this is a totally hypothetical question. But if I think Burke is wrong in the grandfather case. If I think it's wrong. And that decision has to be vacated. Will all grandfathered facilities continue to get secondary service? In other words, is this case just about non-grandfathered customers? Do I have that right or not? This case is in the case of grandfathering the San Francisco. So the other case, San Francisco does not own facilities. For those, but if you're if Burke is wrong about that. And what governs is to 12 F. In other words, if I don't want to get into that argument, because we'll do that in the next 10 minutes or five minutes. I just want to know that if you lose that case. Is this case only about non-grandfathered or am I missing something? I think going forward, your honor, that there would. If I understand San Francisco's argument in the other cases, is there they're advocating for a much broader class of grandfathering going forward. So they would argue. And if the commission were to lose that case, there would be a broader class of facilities that. So so the answer to my question is yes. Right. Grandfathered facilities will get. However, broadly, you define it now abroad, if you do it broadly as San Francisco does. Grandfathered facilities will get secondary service, right? So this case. Either way is only about on grandfather. Right. That's correct. Okay. Thank you. If my colleagues don't have additional questions for you, Mr. editor, we'll hear from the council. Sword. Hey, please, the court. My name is Alexandra Ward on behalf of the intervener for the respondent. First, I'd like to address questions about the system impact study. The system impact study process was not raised by San Francisco. So their failure to raise this argument means it cannot be presented to this court. But for further background on how a system impact study works, it comes after the initial review. He reviews the application. There's nothing in this record that speaks to whether or not PGD disregarded its system impact study practices. Next, I'd like to address the operating numbers question by judge Rogers. Let's be clear then. Before he knows what the system impact study would show. It rules on the request. Your honor. On the broad statement of concerns about safety and reliability. Before when PG receives an application, we conduct an initial review and determine whether or not there's capacity. My question. Yes. Can you please repeat your question, your honor. My question is. As I understand what you're telling me. He interprets the tariff. To me. That. It can consider a request. Deny it. On concerns generally about safety and integrity and reliability. Without knowing what the system impact study. Would show as to any of those factors. The answer is no, your honor PGD would not just deny a request. What PGD looks for in an application is whether all of the information is complete on how the connection and how you would connect at that point of interconnection. My hypothetical is it's a complete application down to the very last attachment. Every statement is complete and accurate. But. The utility says we have no obligation. To ask the requesting party to conduct this study. Because our concern about safety and reliability. Convinces us we should not grant it. No, your honor, what PGD would do is decide. Okay. This request means that you need a primary interconnection and let's study the primary interconnection. So, it's a matter of studying the details of the best point of interconnection. Do you understand what I'm getting at? San Francisco has said a, it has limited space B. If it's not given the secondary, it's got to spend all this money on these facilities. Money it doesn't have. And no one wants to know what the system impact might be. And given that PG&E is a provider and so it has this overview, etc. of the system as a whole, it doesn't need to know the details. In other words, this tariff provision, which appears to be there for a purpose of informing the utility, and maybe the utility would simply say, well, we don't need a provider. But that's not what you're saying. They say they just don't need to ask for it at all. And they would only ask for it if they say, well, we're not sure, so we want to get this study. If San Francisco would like to interconnect a point and has an application submitted to PG&E, PG&E will review the application and per the terms of the tariff, conduct a system impact study if necessary. PG&E does it at its own cost? PG&E does it at San Francisco's cost. As I understand San Francisco, it's not asking for these studies. Your Honor, I think this case really does not come down to the particulars of system impact studies. And there's really not enough in the record to discuss how PG&E conducts its system impact studies. What's really an issue is the fact that San Francisco wants to continue to receive the type of service that it previously received under its old expired agreement when it didn't have to own any of its own facilities. As I understand it, the utility's point is we're concerned about safety and reliability of the system as a whole. Furthermore, some of these areas may be remote. Furthermore, the individual units are not marked. What more has the utility provided? Your Honor, I believe that the record has evidence about the engineering rationale behind why primary interconnections… Well, I've read the declaration. It's very general. He doesn't believe it's good practice. Yes, and beyond that, the operating numbers, which you've asked about earlier, there are no operating numbers at the secondary voltage level. Why can't you put them on? That's what I don't understand. According to my… PG&E didn't say it's impossible for us to add these numbers. It's standard utility practice, Your Honor, in which only primary facilities receive operating numbers. And the switch logs are focused on primary interconnections, and so it gives the direction… That's an operating procedure. We're under a tariff. This is a situation of a request by a requesting party that is not the usual type of request. I'm just trying to understand what we're dealing with here. Otherwise, it looks like there is this unwritten policy. Your Honor, the use of the operating numbers in the practice of having a switch log, that all goes to why it's important for PG&E as the service provider to have discretion when looking at each application on a case-by-case basis on whether… It's an issue, all right? Candidly, FERC has agreed to that. And that's not what the court's questions have been addressing. I think I understand your position. Can I… I'm sorry, were you done, Judge Rogers? Yes, I am. Thank you, Judge Tatel. Can I just pursue this operating number thing? Maybe you could just explain that to me. As I understand it, secondary connections don't have operating numbers, right? That is correct, Your Honor. And so, what's a switch log? So, a switch log is… that's the directions that utility has on how to operate the system. So, an example would be if San Francisco has a police station that's interconnected, and PG&E needs to go out there, and for purposes of maintenance or if there's an emergency, we can read the switch log and all the operating numbers, and we have a clear guide, and there's a distinction that the ownership stop at the meter panel. But it's after that point in which… and that's why there's importance of having clarity in the system in a distinct division, is because if the end user, the police station, is taking service from San Francisco, the secondary system does not allow for a clear understanding of whose materials are whose. Okay. So, I see. So, I hope I understand this enough to ask this question, but why doesn't that problem, that same problem, that is the absence of operating numbers, apply to all of the other customers PG&E serves at the secondary level, like, for example, the 96% of San Francisco customers, PG&E's own retail customers, and the Western Area Power Administration? How come it doesn't… they all get secondary service?  Well, the difference, Your Honor, for PG&E's retail customers is that we understand where the ownership stops, and then it's our retail customer afterwards. Okay. What about the 96%? For the previous… Yeah. Previously interconnected, the 96% of interconnections that are at secondary, Your Honor, those were connected at a time in which, under the 1987 interconnection agreement, where we treated San Francisco like a retail customer, which it is not. And so now, good utility practice and looking forward, which is why we're ending, and this is in our brief that we are currently stating that we will no longer offer primary service, and when the settlement agreements end with Western, we will no longer offer primary or secondary to them. I think that's just circular. You said it's not been a problem in the past for primary service, but now we're not going to offer it anymore. I don't… Why can't PG&E just assign operating numbers to secondary service? Sorry, can you speak up, Your Honor, just a little bit? I'm sorry. Yeah, I'm sorry. Why can't PG&E just assign operating numbers to customers getting secondary service? Your Honor, from my understanding, is that secondary equipment does not include operating numbers, and the operating numbers are only applied at primary. That's not in the record, by the way, is it? That is correct. That's just from my understanding, speaking with our engineers. Yeah, when I read this, I wondered. My first reaction to this, when I saw your argument about it, I looked in the record to see what the explanation was for why you couldn't just assign operating numbers, and FERC didn't even ask that question, did it? FERC didn't address this at all, right? Your Honor, I would say that FERC, as the agency that understands the system, has technical expertise, understands that interconnections at primary are the preference for utility interconnections, and that, although you can't add it to secondary, might not be in the record, is something that FERC could have understood with their expertise when making that determination. Well, too bad they didn't let the court know. I guess my point is, I can understand if I own a piece of equipment, I don't want PG&E coming in and putting numbers on it. There's numbers all over it, all right? But PG&E can say, well, we're not going to provide service unless we can put numbers so that we can identify the equipment. And therefore, when we get a call from the police station saying there's a fire or something's not working, we'll know what piece of equipment to look at because our service logs will identify it. I mean, that's a problem that PG&E has, that appears to be of its own making. That's all I'm getting at. And maybe there's a good explanation, but it's not in the record. Your Honor, I would say it's really about the utility-to-utility relationship that's most important. It's the police station, in your example, shouldn't be calling PG&E. They should be calling San Francisco as their provider. So the call comes in from San Francisco saying we've got a problem at the police station. PG&E says, well, we have no idea where it's located because those facilities are not marked. I mean, counsel, this is not rocket science. That's all I'm getting at. Anything further? I have one more question. We had a debate, a little bit of a debate with counsel for San Francisco and FERC about this July 2019 letter from PG&E and its role in this. Do you want to say something about that? Can you help us understand what role that letter played and whether FERC is right that whether, I mean, FERC says in its decision that PG&E had no written or unwritten policy of denying service for interconnections serving more than 75 kilowatts. But this letter seems to suggest the opposite. Doesn't it? Your Honor, when I read the letter, I don't think that it explicitly states that moving forward from that date on that we are no longer providing service, secondary service for loads above 75 kW. What Mr. Hall and Michael's declaration says and what's PG&E's practice is that when CCSF applies for an interconnection and requests secondary service, that PG&E looks at the existing distribution infrastructure in the vicinity of the service request to determine whether there'll be sufficient existing capacity to serve CCSF load at secondary. So it is PG&E's practice, and there have been connections beyond the letter in 2018. I think that's most important to note if you were to look at filings at FERC that there have been connections at secondary loads above 75 kW. Okay. Thank you, Ms. Ward. Well, Ms. Mapes, you have, I believe you have seven minutes left in your argument. Use rebuttal if you'd like. Thank you. I have a few points I'd like to clarify if I can. The first is I want to address what Ms. Ward just referenced, which was Mr. Hall and Michael's declaration. And you can find this, I believe, at JA 172. And unfortunately, FERC and PG&E have been quoting one sentence of that declaration where he does say that if they receive a request for secondary service, they evaluate the capacity on the system. If you continue on to the next sentence, he says that if that request is for 75 kW or above, they will deny it. I would also say that we did address the process for connecting loads under the tariff in our initial brief and unfortunately, I don't have the JA site, but that was pages 53 and 54 of our brief. So that is not a new argument. And there was one other point I wanted to make a correction on. Judge Tatel, in response to your question about the relationship between this case and the grandfathering case, I would differ with FERC counsel. The primary and secondary facilities at issue here are different than the intervening facilities. So if you look at Section 14.2 of the tariff, you'll see a chart showing the intervening facilities needed for primary interconnections and the intervening facilities needed for secondary interconnections. So San Francisco does actually at many points own intervening facilities at primary and at secondary. Those are different sets of facilities. Even if we win in the 212H case, if we lose in this case, PG&E would continue to say that we cannot connect even grandfathered loads above 75 kilowatts to the secondary system. That's very helpful. Thank you.  More broadly, I wanted to talk a little bit. Do I have to ask you to repeat the JA site? Yes, Your Honor. That Hyla-Michael declaration was JA. No, no, the intervening facilities showing the difference. Oh, that was the tariff, Section 14.2. And I apologize, I don't have that JA site. Oh, I thought you had a listing. No, I've got 14.2. I thought there was an actual listing. All right. Thank you, counsel. There's, you know, I believe it might be in a, there's a chart. It's further down in 14.2. There's a chart showing the intervening facilities for different kinds of interconnections because it also includes. Right. Thank you. More broadly, I wanted to talk about the relationship of this case to FERC's open access policies because we've been hearing a lot about, well, PG&E might deny San Francisco's requested interconnection and then negotiate with San Francisco or PG&E negotiated with Western or, well, they got that under the old bilateral tariff. PG&E transitioned to service under this open access tariff to San Francisco in 2015. FERC has been very clear that part of the reason it enacted its open access reforms in Order 888 was to remedy the kind of discrimination it found in bilateral agreements under the old system. And frankly, it called PG&E out explicitly in Order 888 as an example of a utility that was creating that kind of discrimination in bilateral agreements, requiring San Francisco to go through a lengthy negotiation for each routine city pool or library that it wants to connect to PG&E's secondary system is more or less the epitome of undue discrimination. It is not open access to PG&E's distribution system, which is what it's provided for in its wholesale distribution tariff. And moreover, the July 2019 letter actually says that PG&E won't do that anymore. I believe what it says... Where is that? Jay, can you just point me to where that is, July 2019 letter? Where that is? You know... I left that over here. The July 2019 letter is at JA-284. And it's discussed in, I believe, PG&E's pleadings at JA-158 and JA-172. And what that says is that PG&E will not continue granting accommodations unless essentially the entire case is settled or the resolution of the entire case is reached. And if a resolution of the entire case was reached, we wouldn't be here. That went up to FERC. FERC denied our complaint. That was the resolution. And unless there are any more questions, I'm going to end my time. Thank you very much. Thank you, counsel. Thank you to all counsel who will take this case under submission.
judges: Srinivasan, Rogers, Tatel